# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

RICHARD P. GRABER,

    Plaintiff,

  v.            Case No. 11-C-1038

SHERIFF DAVID A. CLARKE, JR.,
EDWARD H. BAILEY, and
COUNTY OF MILWAUKEE,

    Defendants.

## DECISION AND ORDER FOLLOWING BENCH TRIAL ON LIABILITY

## I. INTRODUCTION

On June 24, 2010, a 13.5-ton concrete slab fell from the O'Donnell Park parking garage at Milwaukee's lakefront, killing a fifteen-year-old boy and injuring his friend and the friend's mother.[1] Because O'Donnell Park is a Milwaukee County facility, the Sheriff's Office was called on to respond and did so by, among other things, assigning mandatory overtime to deputy sheriffs at the County Correctional Facility–Central (like the parties, I will simply refer to it as the "jail") to secure the scene. The plaintiff, former Deputy Sheriff Sergeant Richard Graber ("Graber" or "Sergeant Graber"), was staffed at the jail but not assigned mandatory overtime on June 24. Graber was also vice president of the Milwaukee Deputy Sheriffs' Association ("MDSA") at the time.

---

[1] *See* Ryan Haggerty et al., *Search for Cause of Collapse Will Take Time, Sheriff Says*, MILWAUKEE JOURNAL SENTINEL, June 25, 2010, http://www.jsonline.com/news/milwaukee/97153569.html.

The next day, June 25, 2010, jail employees complained to Sergeant Graber about the mandatory overtime at O'Donnell Park. Graber, in turn, complained to former Sergeant Carol Mascari ("Mascari" or "Sergeant Mascari"), Captain Thomas Meverden ("Meverden" or "Captain Meverden"), and Deputy Inspector Kevin Nyklewicz ("Nyklewicz" or "Deputy Inspector Nyklewicz"). As a result of these complaints, Graber was ordered by Inspector Edward Bailey ("Bailey" or "Inspector Bailey") to meet with Sheriff David Clarke ("Clarke" or "Sheriff Clarke"). What happened during that meeting led to this 42 U.S.C. § 1983 lawsuit, in which Graber alleges that Sheriff Clarke, Inspector Bailey, and the County violated his First Amendment rights to free speech and association, as well his rights under the Wisconsin Law Enforcement Officers' Bill of Rights.

On February 6 and 7, 2013, the parties appeared for a trial to the court on the issue of liability. At the conclusion of the trial, the court ordered briefing on the issues raised in the case. Briefing is now complete, and the case is ready for resolution. The following decision constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. For the following reasons, the plaintiff shall take nothing from the defendants, and this action will be dismissed with prejudice.

## II. FACTS

At trial, everyone agreed that the June 24, 2010, incident at O'Donnell Park was an emergency. (Tr. 40-41, 122, 172-74, 309, 349.) In the immediate wake of the accident, Captain Meverden of the Patrol Division, who was the "incident commander" on the scene, ordered deputy sheriffs from the jail to secure the "inner perimeter" at O'Donnell Park, which meant mandatory overtime for these officers. (Tr. 109-11, 121.) At 6:00 a.m. on June 25, however, Meverden ordered Sergeant Mascari, also of the Patrol Division, to begin making calls for volunteers in an effort to comply with the MDSA's collective

2

bargaining agreement ("CBA").[2] (Tr. 112-13, 121.) The volunteer-based staffing was to begin at 10:00 p.m. on June 25. (Tr. 113, 121.)

Just before 6:00 a.m. on June 25, 2010, Sergeant Graber arrived at the jail to start his shift as the "intake sergeant," whose responsibilities did not include staffing deputy sheriffs. (Tr. 135-37.) Graber was on duty and in uniform throughout the day. (Tr. 240.) He was immediately approached by a deputy sheriff who complained about the mandatory overtime at O'Donnell Park. (Tr. 137.) Graber then called Deputy Roy Felber ("Felber" or "Deputy Felber"), the president of the MDSA, who worked closely with Graber on all union-related matters. (Tr. 138-39, 290, 294.) Felber had not heard about the situation and told Graber that he, Graber, should handle it. (Tr. 139, 294.)

At about 7:30 a.m., Sergeant Graber called Sergeant Mascari, believing that he was performing "Step 1" of the CBA's grievance process.[3] (Tr. 139, 142-43.) Graber politely informed Mascari that he

---

[2] The CBA's overtime provision, 3.02, provides that "[a]ll scheduled overtime shall be assigned within classification as follows:"

    (c)    In the event an employee refuses to accept an overtime assignment or there are
           insufficient volunteers for the work unit where overtime is required, the least
           senior employee in the classification in the work unit shall be required to work the
           overtime assignment.

    . . .

    (e)    For an event identified by the Sheriff as a Special Event, the above procedure shall
           be utilized on a departmental basis. In the event there are insufficient volunteers
           for a Special Event overtime assignment the Sheriff shall rotate in the inverse
           order of seniority among all employees in the department in the classification.

(Ex. 1, pp. 4-5.)

[3] "Step 1" of the grievance procedure calls for "[t]he employee alone or with his/her representative [to] explain the grievance verbally to the person designated to respond to employee grievances in his/her department." (Ex. 1, p. 47.) "Step 2" calls for a "grievance in writing on the Grievance Initiation Form." (Ex. 1, p. 47.)

3

believed the mandatory overtime violated the CBA. (Tr. 142.) Mascari questioned whether the CBA was being followed but "could [not] do [anything] about it." (Tr. 88.) At that point, Captain Meverden walked past Mascari's desk, overheard Graber on the speakerphone, and "inserted" himself into the conversation. (Tr. 113-14, 180-81.)

Although the discussion then became somewhat "heated," neither Sergeant Mascari nor Captain Meverden thought Sergeant Graber was being rude or insubordinate; nor did Graber impede their ability to staff the incident. (Tr. 89, 91, 119, 124.) Meverden explained to Graber that he did not agree that the mandatory overtime violated the CBA, and more importantly, that jail deputies were the only ones available to staff O'Donnell Park because deputies from other divisions were already "extended"—that is, already working significant overtime.[4] (Tr. 124-27, 140, 181-82.) Meverden also told Graber that staffing on a volunteer basis would begin at 10:00 p.m., in accordance with the CBA. (Tr. 126, 183.) The conversation ended with both men believing that the matter had been resolved. (Tr. 127, 140, 183.)

Shortly thereafter, however, Sergeant Graber encountered Deputy Joseph Quiles ("Quiles" or "Deputy Quiles"). (Tr. 143.) Deputy Quiles relayed that he had worked at the jail on June 24 from 2:00 p.m. to 10:00 p.m., had then been assigned mandatory overtime at O'Donnell Park until 8:30 a.m. on June 25, and was later supposed to return to the jail at 2:00 p.m. for his next shift. (Tr. 143-44, 273-75.) Quiles approached Graber because of his status as the vice president of the MDSA. (Tr. 276.) Graber testified at trial that he was concerned for the deputies' safety and the public's safety because deputies

---

[4] Among other things, June 24, 2010, was the opening day of Summerfest, the world's largest music festival, which also takes place at Milwaukee's lakefront. (Tr. 79.) Indeed, Jared Kellner, the boy who was killed at O'Donnell Park, was on his way to Summerfest when the accident occurred. *See* Haggerty et al., *supra* note 1.

4

usually needed at least eight hours of rest between shifts. (Tr. 144.) According to Deputy Inspector Nyklewicz, however, Deputy Quiles was subsequently relieved of his 2:00 p.m. shift at the jail. (Tr. 326.)

Following his conversation with Deputy Quiles, at about 9:00 a.m. Sergeant Graber ran into Deputy Inspector Nyklewicz in the jail's administration area. (Tr. 145-46, 322.) What happened during this brief encounter was disputed at trial. According to Graber, Nyklewicz first approached Graber about an unrelated matter involving the MDSA. (Tr. 146.) Graber then politely told Nyklewicz that he was concerned that deputy sheriffs at the jail were getting "burned out" and that, as a result, public safety was implicated. (Tr. 146-47.) Graber did not say, however, that he thought such conditions violated the CBA. (Tr. 186.)

According to Deputy Inspector Nyklewicz, however, Sergeant Graber immediately began yelling about how he was "sick of" Sheriff Clarke "screwing" with the jail deputies. (Tr. 322-23.) Nyklewicz said he would look into the matter and tried to end the conversation, but Graber would not relent, saying that the situation was "ridiculous." (Tr. 322-23.) According to Nyklewicz, Graber never brought up the MDSA and never said anything about his "members," both of which Graber had done in the past when speaking to Nyklewicz about a union issue. (Tr. 324.) Nyklewicz believed that Graber was insubordinate because he was challenging the authority of his superiors and specifically attacking Sheriff Clarke. (Tr. 323.) Indeed, according to Nyklewicz, during his almost 20 years in law enforcement, he had never been spoken to in such a manner. (Tr. 323.)

As a result of the conversation, Deputy Inspector Nyklewicz wanted to open an internal affairs investigation against Sergeant Graber. (Tr. 325.) But because Nyklewicz had no authority to do so, he

5

sought out Inspector Bailey, the "adjutant"[5] officer to Sheriff Clarke. (Tr. 325, 343.) Bailey was in the Safety Building when he met with an "irate" Nyklewicz. (Tr. 351-52.) Nyklewicz said that he was approached by Graber, who complained that Sheriff Clarke was always "screwing" with the jail deputies. (Tr. 352.) Because the complaint focused on Sheriff Clarke personally, Bailey told Nyklewicz not to open an internal affairs investigation; rather, Bailey would tell Sheriff Clarke about the matter. (Tr. 353.)

At about 11:00 a.m., Inspector Bailey rode with Sheriff Clarke to O'Donnell Park and briefed him on Sergeant Graber's complaints. (Tr. 353.) Graber's comments concerned Bailey because he was forcing Sheriff Clarke's command staff to "rejustify" their decisions in the middle of an emergency, which was "at best a distraction and at worst a hindrance." (Tr. 355.) Bailey was also concerned that a sergeant would openly show disrespect to a senior command member. (Tr. 354.) Sheriff Clarke told Bailey not to authorize an internal affairs investigation because Clarke would speak to Graber directly. (Tr. 356.) Bailey later called Graber to arrange a meeting that afternoon. (Tr. 357.) Bailey did not tell Graber that he would also be meeting with Sheriff Clarke. (Tr. 358.)

When Sergeant Graber arrived at the meeting, Inspector Bailey raised the subject of recording devices.[6] (Tr. 150, 358.) Bailey then brought Sheriff Clarke into the room. (Tr. 358.) There are three different versions of what happened over the next few hours.[7]

---

[5] "Adjutant" is a military term for an executive officer who handles administrative matters to free up the commander's time. (Tr. 344.)

[6] Sergeant Graber also thought that Inspector Bailey "look[ed] [him] over" to see if he was wearing a recording device. (Tr. 150-51.) While Graber found this unusual, Inspector Bailey testified that he was simply enforcing a policy governing meetings with Sheriff Clarke. (Tr. 358, 367.)

[7] Sergeant Graber testified that the meeting lasted about two hours. (Tr. 151.) Inspector Bailey said that the meeting lasted 90 to 120 minutes. (Tr. 372.) Sheriff Clarke only recalled that the meeting lasted "too long." (Tr. 44.)

6

According to Sergeant Graber, Sheriff Clarke went on a profane, hostile rant during which he got "close to [Sergeant Graber's] face" in an attempt to "bully" and "intimidate" him. (Tr. 153-54, 159.) Clarke told Graber that he was a "sick fuck" for questioning staffing when there was a "dead child at the lakefront"; that Clarke was "hearing [Sergeant Graber's] name too much lately"; that Graber should go to Inspector Carr with union issues and that, if Graber did not do so, Clarke would "come after" him; and, that Graber was a "terrorist," a "cancer to the agency," and "just like the rest of them," which Graber interpreted to mean the MDSA board. (Tr. 153-55.) Sheriff Clarke said that he "kn[e]w [Sergeant Graber's] kind" and wanted to "get rid of a waste like [Graber]," and that "[t]he public hates unions [and] they love me."[8] (Tr. 156-58.) Clarke did not, however, try to discourage Graber from filing a grievance. (Tr. 158.)

Sheriff Clarke had a very different recollection of the meeting. According to Clarke, he never used profanities in "addressing" Sergeant Graber—for example, Clarke recalled that he might have said, "I can't believe this shit," but then volunteered during his testimony that he never called Sergeant Graber a "shithead." (Tr. 31.) Instead, Clarke told Graber that he was "getting in the way of [the] command staff" and being "insubordinate." (Tr. 32, 36.) More specifically, Clark said that Graber was "interfering with [the] command staff's carrying out of [Sheriff Clarke's] orders" regarding the O'Donnell Park incident—that is, the command staff was dealing with Graber rather than attending to more important matters. (Tr. 35, 42.) According to Clarke, he did tell Graber that he, Graber, should address questions

---

[8] Even according to Sergeant Graber, however, unlike Sheriff Clarke, Inspector Bailey never swore, raised his voice, mentioned unions, made threats, or engaged in any other retaliatory acts. (Tr. 203.)

regarding CBA interpretations to Inspector Carr, but he never threatened to "come after" Graber.[9] (Tr. 32, 47.) According to Clarke, Graber was the first to speak about unions. (Tr. 44.) Clarke told Graber that he could file a grievance if he had concerns, but that he should stay out of the command staff's way.[10] (Tr. 43.) Graber, however, kept pressing the union issue. (Tr. 44.) Clarke admitted that he did call Graber an "organizational terrorist," but he used that term because Graber was being self-centered instead of showing respect for the accident victims. (Tr. 81-83.)

Inspector Bailey's version of the meeting fell somewhere in between that of Graber's and that of Clarke's. According to Bailey, who was present for the entire meeting,[11] when Sheriff Clarke entered the room, he was "very direct" with Sergeant Graber and confronted him about "blocking the allocation of resources to O'Donnell Park." (Tr. 359.) Graber was the first to speak about unions, which Bailey thought was "in deflection of what the sheriff was trying to get him to understand was an issue of command." (Tr. 359.) At that point, the conversation turn into an "argumentative" one between "the vice-president of a labor union and the head of a police agency," although Clarke still did more of the talking. (Tr. 373, 375.) Clarke told Graber that the issue was not unions but was a "dead child at the lakefront." (Tr. 360.) Still, Graber expressed no concern for the accident victims. (Tr. 360.) Clarke explained that, if the union had a problem, Graber should talk to Inspector Carr. (Tr. 360.) When the

_____

[9] Sheriff Clarke's Directive No. 18-08 states that when a "supervisory member" is questioned by, among others, an "executive board officer . . . of the [MDSA] over . . . an issue arising from the [CBA]," the MDSA official is to be directed to contact their legal counsel, or Inspector Kevin A. Carr." (Ex. 20.)

[10] Sheriff Clarke testified that he expected the deputy sheriffs assigned mandatory overtime to "comply and grieve," meaning to comply with orders immediately and grieve later. (Tr. 49-50.)

[11] At one point, Sheriff Clarke told Inspector Bailey to get Captain Meverden on the phone, which took Bailey about 15 or 20 minutes to do, but Bailey used a phone in the meeting room. (Tr. 358.) Clarke eventually changed his mind about speaking with the captain. (Tr. 358.)

8

issue of grievances arose, Clarke told Graber he could "file all the grievances [he] want[s]." (Tr. 360.) According to Bailey, the discussion was "intense" and "heated," but Clarke was not yelling, pointing, or using "unending profanities and vulgarities." (Tr. 373.) The meeting ended when Clarke told Graber that he was free to go. (Tr. 374.)

Neither Sergeant Graber nor any other MDSA member ever filed a grievance concerning the staffing at O'Donnell Park. (Tr. 165, 311.) After his meeting with Sheriff Clarke, however, Graber had trouble focusing, called in sick more, and withdrew from MDSA activities, although he remained the association's vice president. (Tr. 160, 167, 304-05.) In November 2010, Graber received a seven-day suspension arising out of his signing of a subordinate's "memo book."[12] (Tr. 160, Ex. 12.) Other sergeants also signed the book, but only Graber was investigated; nevertheless, the investigation began back in December 2009. (Tr. 162, 209, Ex. 12.) Also in 2009, the Sheriff's Office took over management of the House of Correction in Franklin, which is now called the County Correctional Facility–South. (Tr. 363.) The acquisition was "crippling" for the internal affairs division, so investigations during that time took longer than usual. (Tr. 364-66.)

In May 2011, Sergeant Graber testified at a hearing before the Wisconsin Employment Relations Commission ("WERC") that he "was not disciplined for [his] conduct as a union official for anything about O'Donnell Park." (Tr. 207-08.) In September 2011, an arbitrator overturned the seven-day suspension that Graber had received for signing the subordinate's memo book, finding that the County "lacked just cause" to discipline Graber. (Ex. 5.) Graber had also received suspensions in 2006, 2008, and 2009 that were subsequently overturned. (Exs. 6-8.)

---

[12] A "memo book" is a notebook containing an officer's case notes, which may be used as evidence in court. (Tr. 211.)

9

On November 10, 2011, Sergeant Graber commenced the instant action. In May 2012, Graber received a disability retirement, retroactive to July 2011. (Tr. 128.) Graber received this retirement at a very young age (he was 45 years old at trial) because of "on-the-job stress caused by Sheriff Clarke." (Tr. 128.) When asked at trial whether he was trying to further a "political agenda" on June 25, 2010, Graber responded, "I don't know." (Tr. 240.)

### III.  DISCUSSION

Graber's amended complaint alleges three counts. Counts I and II arise under 42 U.S.C. § 1983 and allege violation of the First Amendment rights to free association and free speech, respectively. Count III alleges violation of the Wisconsin Law Enforcement Officers' Bill of Rights pursuant to Wis. Stat. §§ 164.015 and 164.03. The court will begin its discussion with the First Amendment claims.

**A.  Counts I and II: First Amendment Retaliation Pursuant to 42 U.S.C. § 1983**

In evaluating a § 1983 claim for retaliation in violation of the First Amendment, the Seventh Circuit continues to apply an analysis premised on the Supreme Court's decision in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977). *Greene v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011). First, the court must determine whether the employee's speech is constitutionally protected. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). Second, the plaintiff must establish that he suffered a deprivation likely to deter free speech. *Id*. And third, the plaintiff must prove causation. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964-65 (7th Cir. 2012). The court will address each element in turn.

10

### 1.    Protected Speech

"The inquiry into the protected status of speech is one of law, not fact." *McArdle v. Peoria Sch. Dist. No. 150*, 705 F.3d 751, 754 (7th Cir. 2013).   As a result, the court "must make a threshold determination as to whether the speech that allegedly motivated the employer's adverse action was protected by the Constitution." *Id.*  This inquiry is comprised of three issues: (1) whether the plaintiff was speaking "as a citizen"; (2) whether the plaintiff spoke on a "matter of public concern"; and (3) whether balancing the plaintiff's interest, as a citizen, in commenting on the matter against the state's interest, as an employer, in promoting effective and efficient public service weighs in favor of deeming the speech "protected." *See Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007) (hereinafter, "*Spiegla II*").

The court pauses here to address Graber's argument that the analysis just described should not apply to his free association claims.  As Graber concedes, however, such a finding would defy Seventh Circuit precedent.  *See Klug v. Chi. Sch. Reform Bd. of Trs.*, 197 F.3d 853, 857 (7th Cir. 1999) ("In this circuit, a public employee is protected from adverse employment consequences based on the exercise of the right to freedom of association only when the associational conduct relates to a matter of public concern."); *see also Montgomery v. Stefaniak*, 410 F.3d 933, 937 (7th Cir. 2005) (reaffirming *Klug*).  Moreover, the evidence at trial overwhelmingly showed that Graber's associational claims are predicated on the same activities as his speech claims—namely, his complaints (allegedly, in his capacity as a union official) on June 25, 2010, to: (1) Sergeant Mascari and Captain Meverden, (2) Deputy Inspector Nyklewicz, and (3) Sheriff Clarke.[13]  Because speech and association are intertwined here, the court finds

---

[13] The only possible purely associational claim involves Sergeant Graber's allegation that he was suspended *prior* to June 25, 2010, because of his union activities.  But other than pointing to arbitrators' decisions overturning the suspensions, Graber presented no evidence of a causal connection between his union involvement and the discipline.  Nor did he specify what union activities triggered the suspensions. Accordingly, to the extent that Graber asserts a purely associational claim based on such suspensions, this

11

it especially appropriate to analyze the First Amendment claims together, under the free speech framework. *See Balton v. City of Milwaukee*, 133 F.3d 1036, 1041 (7th Cir. 1998) (Cudahy, J., concurring) (arguing that, while the *Connick* and *Pickering* tests may not be appropriate for "purely associational claims," their analysis easily applies to "hybrid" claims involving both speech and association).

### a.      Speaking as a Citizen

In *Garcetti v. Ceballos*, 547 U.S. 410, 421-22 (2006), the Supreme Court explained that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." In other words, "public employees have no cause of action for First Amendment retaliation unless they were disciplined for speaking *as citizens* about a matter of public concern." *Spiegla II*, 481 F.3d at 963. Notably, the Seventh Circuit has held that where "comments that precipitated the adverse action . . . were made in [a deputy sheriff's] capacity as a union representative, rather than in the course of his employment . . . [*Garcetti*] is inapposite." *Fuerst v. Clarke*, 454 F.3d 770, 774 (7th Cir. 2006); *see also Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1123 (7th Cir. 2009) (reaffirming *Fuerst*).

Regarding his first conversation with Sergeant Mascari and Captain Meverden, the court finds that Sergeant Graber was speaking in his capacity as a union representative during that conversation. Graber's call to Mascari was prompted by a deputy sheriff informing Graber about the mandatory overtime at O'Donnell Park. Graber was not in charge of staffing jail employees on June 25, 2010; rather, he was concerned that the Patrol Division was violating the CBA. Indeed, Graber's call to Mascari was preceded by a call to Deputy Felber, the president of the MDSA, to inform him about the

claim will be dismissed.

situation. Although Graber may not have been technically performing "Step 1" of the grievance procedure, it is nevertheless understandable that Graber would call Mascari because, after all, she was assisting Meverden with staffing.

Regarding his second conversation with Deputy Inspector Nyklewicz, however, the court finds that Sergeant Graber was not speaking in his capacity as a union representative during this conversation. Indeed, after speaking with Sergeant Mascari and Captain Meverden, Graber believed that the CBA overtime matter had been resolved; thus, he had no union-related reason to approach his superior. Graber only approached Nyklewicz because Deputy Quiles had told Graber that he was not getting enough rest between shifts; Graber admittedly did not tell Nyklewicz that such conditions violated the CBA. And, according to Nyklewicz, whom the court found to be quite credible, Graber lodged a personal attack, saying that he was "sick of" Sheriff Clarke "screwing" with the jail deputies. Graber never brought up the MDSA and never said anything about his "members," both of which he had done in the past when speaking to Nyklewicz about a union issue.

Finally, regarding the third conversation, i.e. the one with Sheriff Clarke, the court finds that, at some point during such conversation, Sergeant Graber was speaking in his capacity as a union representative. Indeed, both Clarke and Inspector Bailey testified that the subject of unions was discussed during the meeting. According to Bailey, at that point, the conversation turned into one between a union representative and an employer.

Given the foregoing, the court finds that Sergeant Graber's statements to Sergeant Mascari and Captain Meverden, as well as his comments to Sheriff Clarke (at least some of them), pass *Garcetti*. However, and to repeat, his comments to Deputy Inspector Nyklewicz do not pass *Garcetti*, as they were

13

not made in his capacity as a union representative. For the sake of completeness, the court will nevertheless proceed with the First Amendment analysis for all three conversations.

### b. Matter of Public Concern

Once *Garcetti* is satisfied, then the court must turn to, and apply, *Connick v. Myers*, 461 U.S. 138 (1983). At this point in the analysis, the court must decide whether the plaintiff spoke on a "matter of public concern" by considering the "content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147-48. "[I]f the objective of the speech—as determined by content, form, and context—is simply to further a purely personalized grievance, then the speech does not involve a matter of public concern." *Kristofek v. Vill. of Orland Hills*, – F.3d –, 2013 WL 932016, at *6 (7th Cir. Mar. 11, 2013). "The motive of the speaker is relevant as part of the 'context' in which the speech was made, . . . but content 'remains the most important factor.'" *Id.* at *3. The Seventh Circuit has recognized that union activity, "in a broad sense, touches upon matters of public concern," but "the fact that an employee's expression concerns a topic of public import does not automatically render his expression protected." *Gregorich v. Lund*, 54 F.3d 410, 415 (7th Cir. 1995) (internal quotations omitted).

Regarding his conversation with Sergeant Mascari and Captain Meverden, the court finds, on balance, that Sergeant Graber was speaking on a matter of public concern. To repeat, Graber's call to Mascari was prompted by a deputy sheriff informing Graber about the mandatory overtime being assigned at O'Donnell Park. Graber was not in charge of staffing jail employees on June 25, 2010, nor was he himself assigned mandatory overtime. Instead, Graber was concerned that the Patrol Division was violating a CBA provision, the effects of which would be felt by the public during the emergency. *See Gustafson v. Jones*, 290 F.3d 895, 907 (7th Cir. 2002) ("[I]t would be difficult to find a matter of greater

14

public concern in a large metropolitan area than police protection and public safety.") (internal quotations omitted).

By the time he spoke to Deputy Inspector Nyklewicz, however, Sergeant Graber knew that: (1) jail deputies were the only ones available to staff the O'Donnell Park incident because deputies from other divisions were already "extended"; and (2) staffing on a volunteer basis would begin that evening. Graber only approached Nyklewicz because Deputy Quiles had told Graber that he was not getting enough rest between shifts; Graber admittedly did not tell Nyklewicz that such conditions violated the CBA. More importantly, this situation did not implicate the public interest because, as Graber knew, *any* employee assigned to O'Donnell Park would be similarly "burned out" because *all* employees were working overtime. Rather, Graber approached Nyklewicz because he personally was "sick of" Sheriff Clarke "screwing" with the jail deputies. Such being the case, the objective of this speech was not "to bring about change with public ramifications extending beyond the personal." *Kristofek*, 2013 WL 932016, at *6.

Sergeant Graber's third conversation, i.e., the one with Sheriff Clarke, is somewhat murky. To be sure, and as already discussed, at some point, Graber brought up the subject of unions and was speaking in his capacity as a union representative. But Graber had already received a satisfactory answer to the specific union-related matter in question. In the end, the court finds that, although Graber's speech during this particular conversation may have touched tangentially on issues of interest to the public, its primary purpose was to defend against Clarke's alleged attacks and to advance the interests of his work colleagues at the jail. *See Colburn v. Trs. of Ind. Univ.*, 973 F.2d 581, 587 (7th Cir. 1992) (finding that the plaintiffs did not speak on a matter of public concern, even though they sought to further their co-

15

workers' interests, because the statements were "much more akin to an effort to resolve an internal squabble than to statements by individuals speaking out as citizens").

Accordingly, it is only Sergeant Graber's statements to Sergeant Mascari and Captain Meverden that pass *Connick*. For the sake of completeness, however, the court will continue with the First Amendment analysis for all three conversations.

### c. Balancing of Interests

Once *Connick* is satisfied, then the court must turn to, and apply, *Pickering v. Board of Education*, 391 U.S. 563 (1968). Here, the court "balance[s] [the plaintiff's] interest as a citizen in commenting on the matter against the state's interest, as employer, in promoting effective and efficient public service." *Spiegla v. Hull*, 371 F.3d 928, 940 (7th Cir. 2004) (hereinafter, "*Spiegla I*"). The factors to consider are:

> (1) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her daily responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Kokkinis v. Ivkovich*, 185 F.3d 840, 845 (7th Cir. 1999) (internal quotations omitted). The Seventh Circuit has emphasized that "[d]eference to the employer's judgment regarding the disruptive nature of an employee's speech is especially important in the context of law enforcement." *Id.*

Regarding his conversation with Sergeant Mascari and Captain Meverden, the court finds that Sergeant Graber's interest prevails. Again, the call to Mascari was prompted by a deputy sheriff informing Graber about the mandatory overtime at O'Donnell Park. As the vice president of the MDSA, Graber was entitled to follow up on this information. Indeed, at the time of his call, Graber had no knowledge that: (1) jail deputies were the only ones available to staff the O'Donnell Park incident

16

because deputies from other divisions were already "extended"; or (2) staffing on a volunteer basis would begin that evening. Moreover, the call was brief, relatively calm, and not disruptive to either Mascari or Meverden.

This is not so, however, for Sergeant Graber's conversation with Deputy Inspector Nyklewicz. At that point, Graber had received a satisfactory answer to his union-related concern. But instead of backing down or filing a grievance, Graber approached Nyklewicz in a uniquely insubordinate manner because he was "sick of" Sheriff Clarke "screwing" with the jail deputies. Nyklewicz was so upset by the conversation that he immediately contacted Inspector Bailey and sought to open an internal affairs investigation. Bailey was likewise concerned that Graber was forcing the command staff to rejustify their decisions, as well as was openly showing disrespect to Sheriff Clarke. The context here is critical. The court finds that, in the midst of the emergency at O'Donnell Park, Graber's superiors were entitled to take action to remedy a possible disruption to the command staff. *See Kokkinis*, 185 F.3d at 845 (finding that a government employer is allowed to consider the *potential* disruptiveness of the employee's speech); *see also Williams v. Seniff*, 342 F.3d 774, 783 n.6 (7th Cir. 2003) (distinguishing *Gustafson* because in that case, "there was neither evidence that the speech was disruptive, nor that the defendants believed it would have future disruptive consequences").

A similar analysis applies to Sergeant Graber's conversation with Sheriff Clarke. Clarke was reacting to information from Inspector Bailey indicating that Graber had been insubordinate and disruptive to Deputy Inspector Nyklewicz. Accordingly, any interest that Graber had on commenting about unions was outweighed by Clarke's interest in maintaining order and discipline during an emergency. *See Kokkinis*, 185 F.3d at 845-46 ("[T]he public safety employer's determinations of both

17

the potential for disruption as a result of the speech, as well as the employer's response to the actual or perceived disruption, are entitled to considerable judicial deference.") (internal quotations omitted).

Thus, it is only Sergeant Graber's statements to Sergeant Mascari and Captain Meverden that pass *Pickering*. Consequently, Graber did not have a protected First Amendment right to make his remarks to Deputy Inspector Nyklewicz or to Sheriff Clarke.

### 2.   Deprivation Likely to Deter Free Speech

Proving a "deprivation" likely to deter the exercise of free speech under § 1983 is a less onerous burden than proving an "adverse action" in the Title VII context. *Spiegla I*, 371 F.3d at 941. "Although isolated criticisms may not suffice, . . . harassment of a public employee violates the First Amendment unless the harassment is so trivial that a person of ordinary firmness would not be deterred from . . . expressing those beliefs." *Massey*, 457 F.3d at 720 (internal quotations omitted); *c.f. Hutchins v. Clarke*, 661 F.3d 947, 957 (7th Cir. 2011) (finding Sheriff Clarke's disclosure of disciplinary history not actionable because it "was not accompanied by threat, coercion, or intimidation intimating punishment").

Sergeant Graber alleges two deprivations: (1) Sheriff's Clarke's intimidations during their meeting on June 25, 2010, and (2) Graber's seven-day suspension in November 2010. To be sure, a suspension is obviously actionable. But whether Clarke's comments during the meeting rise to that level is a closer question.

If Sergeant Graber's testimony is to be believed, Sheriff Clarke went on a two-hour profane rant, getting in Graber's face and making threats. Such conduct would clearly have a strong potential to deter speech. Of course, Clarke and Inspector Bailey denied most of Graber's allegations. Nevertheless, Clarke did admit to calling Graber an "organizational terrorist" and to using profanities, although he tried to soften this testimony (in my view, unsuccessfully) by stating that he never used profanities in

18

"addressing" Graber. Indeed, Inspector Bailey testified that Sheriff Clarke was "very direct" and confrontational with Sergeant Graber, and that there was an "intense" and "heated" back-and-forth between the men, with Sheriff Clarke doing more of the talking. Accordingly, the court will assume that Sheriff Clarke's remarks to Sergeant Graber during their meeting on June 25, 2010, constituted an actionable First Amendment "deprivation."[14]

### 3.    Causation

The proper test for causation understandably eludes the parties. The Seventh Circuit recently shed some light on the confusion in its case law:

> *In the end*, the plaintiff must demonstrate that, *but for* his protected speech, the employer would not have taken the adverse action. This explains the holdings of *Gross* and *Fairley*, which were cases that discussed the plaintiff's burden of proving causation at trial. *But preliminarily at summary judgment*, the burden of proof is split between the parties. Initially, to establish a prima facie case of retaliation, the plaintiff must produce evidence that his speech was *at least a motivating factor*—or, in philosophical terms, a "sufficient condition"—of the employer's decision to take retaliatory action against him. Then, the burden shifts to the employer to rebut the causal inference raised by the plaintiff's evidence. If the employer fails to counter the plaintiff's evidence, then the employer's retaliatory actions are considered a "necessary condition" of the plaintiff's harm, and the plaintiff has established the *but-for causation* needed to succeed on his claim.

*Kidwell*, 679 F.3d at 965 (internal citations omitted and emphasis added). In sum, because this matter proceeded to trial, the plaintiff must prove "but for" causation.

To repeat, there are two actionable deprivations: (1) Sheriff's Clarke's intimidations during the meeting on June 25, 2010, and (2) Sergeant Graber's seven-day suspension in November 2010.[15] Taking

---

[14] As the court's previous discussion of the facts makes clear, Sergeant Graber fell far short of proving that Inspector Bailey engaged in any act likely to deter free speech. Indeed, Graber makes no argument to this effect in his post-trial briefs. Accordingly, Bailey will be dismissed as a defendant in this action.

[15] In his post-trial brief, Sergeant Graber also briefly mentions that he was suspended for an additional 10 days sometime after June 2010. (Pltf. Op. Br. at 24 n.4.) But the evidence adduced at trial

19

the second deprivation first, Sergeant Graber failed to prove that his seven-day suspension in November 2010 arising out of his signing a subordinate's "memo book" was related to his speech on June 25, 2010. To be sure, while other sergeants also signed the book, only Graber was investigated. But critically, the investigation of the memo book event began in December 2009—that is, six months *before* the O'Donnell Park incident. Graber did not rebut Inspector Bailey's testimony that the investigation may have taken longer than usual due to the 2009 acquisition of the House of Correction in Franklin. Moreover, during a WERC hearing, Graber himself testified that he "was not disciplined for [his] conduct as a union official for anything about O'Donnell Park."

And so Sergeant Graber is left with his allegation that Sheriff Clarke intimidated him during their meeting on June 25, 2010, because of his speech. Recall, however, that only Graber's statements to Sergeant Mascari and Captain Meverden were constitutionally protected. Accordingly, to show causation, Graber needed to prove that "but for" his statements to Mascari and Meverden, Clarke would not have "bullied" him during their meeting.

Sergeant Graber did not make this showing. Instead, the evidence at trial demonstrated that Clarke called the meeting because of Graber's statements to Deputy Inspector Nyklewicz. Clarke and Inspector Bailey both credibly testified that it was Nyklewicz's complaints about Graber that concerned them because Graber was (at least allegedly) being insubordinate, blocking resources, and openly criticizing Clarke. And the court has already held that Graber's statements to Nyklewicz were not constitutionally protected.

---

was wholly insufficient to link this suspension to the O'Donnell Park incident. *See Mullin v. Gettinger*, 450 F.3d 280, 285 (7th Cir. 2006) ("[T]the fact that a plaintiff's protected speech may precede an adverse employment decision alone does not establish causation.").

Thus, even assuming that (1) Sergeant Graber's statements to Sergeant Mascari and Captain Meverden were constitutionally protected, and (2) Sheriff Clarke's comments during the meeting on June 25, 2010, constitute an actionable First Amendment deprivation, Graber's First Amendment claims nevertheless fail because he has not shown that his protected speech *caused* his alleged deprivation. Accordingly, Graber's First Amendment claims will be dismissed.

**B. Count III: Violation of the Wisconsin Law Enforcement Officers' Bill of Rights**

Sergeant Graber also asserts a claim pursuant to the Wisconsin Law Enforcement Officers' Bill of Rights—specifically, Wis. Stat. §§ 164.015 and 164.03. Wis. Stat. § 164.015, entitled "Engaging in Political Activity," reads as follows:

> No law enforcement officer may be prohibited from engaging in political activity when not on duty or not otherwise acting in an official capacity, or be denied the right to refrain from engaging in political activity.

And Wis. Stat. § 164.03, entitled "Recrimination," provides:

> No law enforcement officer may be discharged, disciplined, demoted or denied promotion, transfer or reassignment, or otherwise discriminated against in regard to employment, or threatened with any such treatment, by reason of the exercise of the rights under this chapter.

The Seventh Circuit has interpreted these two provisions to "make[] clear that sergeants are not expected to be political loyalists of the sheriff." *Fuerst*, 454 F.3d at 773. Notably, however, Sergeant Graber does not point to any statement in the Bill of Rights (and the court has found none) authorizing a law enforcement officer to bring a lawsuit to enforce its provisions. Thus, a threshold question, which went unaddressed in the parties' post-trial briefs, is whether such a private right of action may be implied. *See Dautovic v. Bradshaw*, 800 N.W.2d 755 (Iowa Ct. App. 2011) (holding that there is no private right of action to enforce a similar law-enforcement-officers' bill of rights).

21

No matter, though, because Sergeant Graber presented no evidence at trial that he had engaged in any political activity. Indeed, when asked whether his actions on June 25, 2010, were in furtherance of a political agenda, Graber said that he did not know. Furthermore, Graber admitted at trial that he was "on duty" when he made his complaints. Accordingly, Graber's state law claim will also be dismissed.

## IV. CONCLUSION

At first blush, Sergeant Graber's First Amendment claims appeared meaty, as he was undoubtedly suspended by, and allegedly subjected to verbal attacks from, Sheriff Clarke following his complaints/comments on the subject of unions. But after a trial, and upon closer examination, multiple problems with respect to such claims have raised their heads. First, only one of his complaints, that being the one made to Sergeant Mascari and Captain Meverden, was worthy of First Amendment protection. Second, none of the suspensions that Graber suffered had anything to do with any of the complaints. And third, the verbal attacks, assuming they rose to an actionable level, would have occurred even in the absence of the constitutionally protected comments/speech.

In short, Sheriff Clarke probably did (for lack of a better term) "dress down" Sergeant Graber, and he likely did that to an unnecessarily belittling degree. But such dressing down was not because of the protected speech in which Graber had engaged. It was rather because, in Deputy Inspector Nyklewicz's view, Graber seemed to be disrupting the command staff during a true emergency and was insubordinate. To be sure, one might legitimately question whether Sheriff Clarke's vulgarity-laden method of confronting frustration on the part of one of his deputies is a particularly effective way of bolstering morale in the ranks. But that is for the Sheriff to decide. In the end, while the court has sympathy for Sergeant Graber, who clearly was not the same deputy sheriff after his June 25, 2010, meeting with

22

Clarke, the simple fact remains that, for the reasons set forth in this decision, Graber has failed to prove that he is legally entitled to any of the relief that he seeks.

   **NOW THEREFORE IT IS ORDERED** that the plaintiff shall take nothing from any defendant on any claim;

   **IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED WITH PREJUDICE**;

   **IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly.

   **SO ORDERED** this <u>7th</u> day of May 2013, at Milwaukee, Wisconsin.

**BY THE COURT:**

<u>s/ William E. Callahan, Jr.</u>
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge
